# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-91

STATE OF LOUISIANA

VERSUS

MICHAEL THIBODEAUX

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 18-CR-691
HONORABLE LEWIS H. PITMAN, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

John S. McLindon
Walters Papillion Thomas Cullens
12345 Perkins Rd, Bldg 2, Ste
Baton Rouge, LA 70810
(225) 236-3636
COUNSEL FOR DEFENDANT-APPELLANT:
    Michael Thibodeaux

M. Bofill Duhe
District Attorney, Sixteenth Judicial District
Alister Charrier
M. Craig Colwart
W. Claire Howington
Assistant District Attorney
300 Iberia St., Suite 200
New Iberia, LA 70560
(337) 369-4420
COUNSEL FOR APPELLEE:
    State of Louisiana

**PICKETT, Judge.**

## FACTS

The defendant, Michael Thibodeaux, was the duly-elected Clerk of Court for Iberia Parish. A former employee of the clerk's office made allegations of the misuse of funds within the clerk's office which prompted an investigation by the legislative auditor. As a result of that investigation, the legislative auditor alleged the misuse and/or misappropriation of funds maintained by the clerk's office. This evidence was presented to an Iberia Parish Grand Jury.

On June 8, 2018, the grand jury returned a fourteen count bill of indictment charging the defendant with the following offenses:

> Count #1: R.S. 15:1351 et. Seq – RACKETEERING, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 1998, and continuing through and including October 12, 2016, was a member of an Enterprise as defined by La. R.S. 15:1352(B), in that it consists of an individual or other legal entity, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities, and did unlawfully and knowingly conspire and engage in the crime of RACKETEERING, a violation of La.R.S. 15:1353, that is, to knowingly conduct or participate in, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity as defined in La.R.S. 15:1352(A), to-wit: multiple acts of Theft, violations of La.R.S. 14:57; multiple acts of Injuring Public Records, violations of La.R.S. 14:132; and/or multiple acts of Filing or Maintaining False Public Records, violations of La.R.S. 14:133.

> Count #2: R.S. 14:67 – THEFT OVER $25,000, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 1998, and continuing through and including October 12, 2016, did unlawfully engage in the crime of THEFT, violation of La. R.S. 14:67, by the misappropriation or taking with the intent to permanently deprive monies belonging to others on deposit with the Iberia Parish Clerk of Court for advance costs, without their consent and by means of fraudulent conduct, practices, or representations, where the misappropriation or taking amounts to twenty-five thousand dollars ($25,000) or more.

> Count #3 R.S. 14:133 – FILING OR MAINTAINING FALSE PUBLIC RECORDS, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 2005, and continuing through and including October 12, 2016, did unlawfully

engage in the crime of FILING OR MAINTAINING FALSE PUBLIC RECORDS, a violation of La.R.S. 14:133, by filing or depositing in any public office or with any public official, or maintaining as required by law, regulation, or rule, with the knowledge of its falsity, and forged or wrongfully altered document, or document containing a false statement or representation of material fact. (12,137 counts).

Count #4: R.S. 14:134 – MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 2005, and continuing through and including October 12, 2016, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the duty to refund monies belonging to others and on deposit with the Iberia Parish Clerk of Court for advance costs as required by La.R.S. 13:842(B).

Count #5: R.S. 14:134 – MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 2005, and continuing through and including October 12, 2016, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of  La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit:  the duty to remit unclaimed property to the State Treasury in accordance with the Louisiana Uniform Unclaimed Property Act, La.R.S. 9:151 *et seq.*

Count #6: R.S. 14:67 – THEFT OVER $25,000, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, during the month of April 2012, did unlawfully engage in the crime of THEFT, a violation of La.R.S. 14:67, by the misappropriation or taking with the intent to permanently deprive monies belonging to others which had been deposited with the Iberia Parish Clerk of Court for advance costs and for which refund checks had been issued but not negotiated, without their consent and by means of fraudulent conduct, practices, or representations, where the misappropriation or taking amounts to twenty-five thousand dollars ($25,000) or more.

Count #7: R.S. 14:133 – FILING OR MAINTAINING FALSE PUBLIC RECORDS, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, during the month of April 12, 2012, did unlawfully engage in the crime of FILING OR MAINTAINING FALSE PUBLIC RECORDS, a violation of La.R.S. 14:133, by filing or depositing in any public office or with any public official, or maintaining as required by law, regulation, or rule, with the knowledge of its falsity, any forged or wrongfully altered document,

2

or document containing a false statement or representation of material fact. (334 counts).

Count #8: R.S. 14:134 - MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, during the month of April, 2012, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the duty to remit unclaimed property to the State Treasury in accordance with the Louisiana Uniform Unclaimed Property Act, La.R.S. 9:51 *et seq.*

Count #9: R.S. 14:67 – THEFT OF $5,000-$25,000, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 1998, and continuing through and including July 25, 2017, did unlawfully engage in the crime of THEFT, a violation of La.R.S. 14:67, by the misappropriation or taking with the intent to permanently deprive monies belonging to the State of Louisiana, without its consent and by means of fraudulent conduct, practices, or representations, where the misappropriation or taking amounts to five thousand dollars ($5,000) or more but less than twenty-five thousand dollars ($25,000).

Count #10: R.S. 14:134 – MICHAEL THIBODEAUX IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 1998, and continuing through and including July 25, 2017, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the duty to collect all fees and charges due his office and deposit them in the Clerk's Salary Fund, and to keep an accurate set of books in connection with said Fund, in accordance with La.R.S. 13:781.

Count #11: R.S. 14:134 – MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, on or about January 1, 2007, and continuing through and including December 31, 2015, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the prohibition on loan, pledge, or donation of public funds to any person, association, or corporation, as required by La.Const. Art. 7, §14, and the obligation not to misappropriate, misapply, convert, misuse, or otherwise wrongfully take any funds, property, or other thing of value

3

belonging to or under the custody of the public entity in which they hold office or are employed, as required by La.R.S. 42:1461.

Count #12: R.S. 14:123 – PERJURY, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, on or about June 7, 2018, did unlawfully engage in the crime of PURJURY, a violation of La.R.S. 14:123, by intentionally making a false written or oral statement which he knew to be false, under oath, in or for use in a judicial proceeding.

Count #13: R.S. 14:134 – MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, on or about June 7, 2018, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner, or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the duty to testify truthfully under oath in a judicial proceeding, as required by La.R.S. 14:123.

Count #14: R.S. 14:134 – MALFEASANCE IN OFFICE, IN THE PARISH OF IBERIA, defendant MICHAEL THIBODEAUX, beginning on or about January 1, 1998, and continuing through and including July 25, 2017, did unlawfully engage in the crime of MALFEASANCE IN OFFICE, a violation of La.R.S. 14:134, by intentionally refusing or failing to perform any duty lawfully required of him; intentionally performing any lawfully required duty in an unlawful manner; or knowingly permitting any public officer or employee under his authority to do the same, to-wit: the obligation not to misappropriate, misapply, convert, misuse, or otherwise wrongfully take any funds, property, or other thing of value belonging to or under the custody of the public entity in which they hold office or are employed, or required by La.R.S. 42:1451.

This matter was tried by means of a jury trial, and the defendant was found guilty of all fourteen counts.

On July 30, 2019, the district court sentenced the defendant as follows:

Count 1: (Racketeering) Five years at hard labor, suspended, with three years of supervised probation.

Counts 2, 6, & 9: (Felony Theft) As to each count, five years at hard labor, suspended, with three years supervised probation.

Counts 3 & 7: (Filing or maintaining false public records) As to each count, three years at hard labor, with three years of supervised probation.

Count 12: (Perjury) Three years at hard labor suspended, with three years of supervised probation.

The above sentences were ordered to run concurrently with each other.

Counts 4, 5, 8, 10, 11, 13, & 14: (Malfeasance in office) As to each count, thirty months at hard labor, to be served concurrently to each other but consecutive to the other charges.

The defendant has filed this appeal as to the convictions.

## ASSIGNMENTS OF ERROR

1. The Trial Court committed error when it denied a *Batson* challenge made by the defense to the prosecution's using peremptory strikes on African American jurors.

2. The charges against Michael Thibodeaux in Count 6 (Theft), Count 7 (Filing or Maintaining False Public Records), and Count 8 (Malfeasance in Office) are prescribed and the trial court committed error when it denied the defendant's Motion to Quash these charges.

3. There was insufficient evidence to support a conviction against Michael Thibodeaux on all of the Counts set forth in the indictment.

4. The Trial Court committed error when it allowed Roger Harris to testify as an expert witness.

5. The Trial Court committed error when it denied the Motion for Arrest of Judgement, Motion for New Trial, and Motion to Quash Indictment - regarding the improprieties of the District Attorney before the grand jury.

6. Any Counts which were not by a unanimous vote should be reversed.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record.

The trial court ordered the defendant to serve thirty months at hard labor for each of the defendant's convictions for malfeasance in office (Counts 4, 5, 8, 10, 11, 13, and 14), with each of these sentences to run concurrently. On the remaining seven charges, the trial court ordered suspended sentences, each with a three-year period of supervised probation, which would begin when he is released from

5

incarceration. For reasons to be discussed, the convictions and sentences for Counts 2, 12, and 13 must be vacated.

As conditions of the supervised probation on the suspended sentences, the trial court stated that the conditions would be those required by La.Code Crim.P. art. 895(A), with the following special conditions:

> report to the Department of Probation and Parole within twenty-four (24) hours of your release from incarceration; report monthly or as instructed by your probation officer and pay a monthly supervision fee of Sixty Dollars ($60.00); pay court costs and a fine of Five Thousand Dollars ($5,000.00) within the first three (3) months of your release from incarceration; pay restitution of the Offices of Clerk of Court Iberia Parish, Louisiana for the cost incurred and paid in retaining an accounting firm to assist in the refunding of monies belonging to others on deposit with the Clerk of Court of Iberia Parish, Louisiana for advanced court costs; should the defendant agree with the probation officer as to the amount owed in this restitution, restitution is to be paid within six (6) months of date of that agreement; should defendant not agree with the probation officer as to the amount owed in restitution a restitution hearing shall be conducted upon the request of the probation officer; restitution is then to be paid within six (6) months of the date of the restitution hearing, in no event shall restitution exceed Fifty Thousand Dollars ($50,000.00); shall perform two hundred and forty (240) hours of community service within one (1) year from the date of your release from incarceration;

At a subsequent hearing, the trial court clarified that the restitution was strictly to cover the cost of the forensic CPA selected by the Iberia Parish Clerk of Court to determine what monies needed to be reimbursed or paid in restitution. The court was not specific as to which count or counts the restitution and fine were imposed as a part of the sentence. We remand the case with instructions for the trial court to specify the count or counts upon which restitution and the fine are owed.

Further, the trial court ordered the defendant to pay restitution of not more than $50,000.00, based on the cost of the audit. The trial court also allowed a process to invoke a hearing if the defendant disagrees with the amount charged as restitution. We find this sentence is sufficiently determinate. *See State v. Tall*, 12-280 (La.App. 3 Cir. 10/24/12), 100 So.3d 388.

6

## ASSIGNMENT OF ERROR NUMBER SIX

The defendant argues that this court should set aside any charge in which the jury did not reach a unanimous verdict of guilt. The state readily acknowledges that the verdicts for Count 2 (Felony Theft), Count 12 (malfeasance), and Count 13 (perjury) were non-unanimous and must be reversed. Our review of the polling slips confirms that the state is correct.

In *Ramos v. Louisiana*, 590 U.S. ___, 140 S.Ct. 1390 (2020), the Supreme Court ruled that non-unanimous jury verdicts finding a defendant guilty are not constitutionally permissible. In reaching its conclusion, the majority of the Court noted that "Louisiana and Oregon may need to retry defendants convicted of felonies by nonunanimous verdicts whose cases are still pending on direct appeal." Slip Opinion of Justice Gorsuch at p. 22. This is one of those cases. While ordinarily we would review the sufficiency of the evidence under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), and *State v. Hearold*, 603 So.2d 731 (La.1992), we find it imprudent to comment on the evidence in this case that we know must be set aside and may be retried because the United States Supreme Court has given us a clear directive. The convictions and sentences for Counts 2, 12, and 13 are vacated.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant alleges there was insufficient evidence to support a conviction against him on any of the counts set forth in the indictment.

Pursuant to *Hearold*, 603 So.2d 731, we will address this assignment of error first, as a finding that the evidence was insufficient on any conviction would necessitate reversal of said conviction. The analysis of the sufficiency of evidence is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry is whether after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found

the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L Ed. 2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L. Ed. 126 (1979); *State ex rel. Graffagnino v King*, 436 So 2d 559 (La. 1983); *State v Ducan*, 420 So.2d 1105 (La.1982); *State v Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not, second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel Graffagnino,* 436 So 2d 559 (citing *State v. Richardson*, 425 So 2d 1228 (La 1983) In order for this court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

## **THEFT**

The defendant's first argument is that the state failed to prove the theft charges set forth in Counts 2, 6, and 9. Theft is defined by La.R.S. 14:67, which states, in pertinent part:

> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

The defendant was charged with three separate counts of theft, Counts 2, 6, and 9. Count 2 was discussed above, has been vacated, and will not be discussed herein.

Count 6 alleged that the defendant committed theft of over $25,000.00 by misappropriating funds from the advance deposit account for which refund checks had been issued but not negotiated.

Roger Harris, assistant legislative auditor, testified that the Iberia Parish Clerk of Court's office maintains an "advanced deposit account" in which attorneys and litigants deposit money to pay in advance costs associated with the filing of lawsuits. The account is a fiduciary account, and the funds in that account belong to the

attorneys and/or litigants. When the clerk performs work in that suit, payments to the clerk's office are drawn from the deposit. The auditor identified a number of lawsuits which, upon being settled or dismissed, had refunds sent to the interested parties by checks which had not been negotiated after a year. In those instances when a check had not been cashed within a year, the defendant cut a new check from a different check-writing software program than used for day-to-day business which bore the exact check number as the original check but was made payable to the clerk's office "Salary Fund." The Salary Fund is a fund maintained by the clerk's office to pay salaries and general office expenses. Therefore, private funds were removed from the trust account to the clerk's Salary Fund. The evidence presented was uncontroverted. The defendant does not contest that the evidence established this procedure took place. There was no evidence of any attempt to contact the individuals to whom the unnegotiated checks had been written. Louisiana law requires any money that cannot be returned to an individual be sent to the state treasurer. Louisiana Uniform Unclaimed Property Act of 1997, La.R.S. 9:151 – 9:182 This mandate was ignored. The evidence showed that 334 refund checks were recreated in this manner which resulted in the amount of over $47,000.00 being transferred from the advance deposit fund to the clerk's Salary Fund.

Count 9 alleged that the defendant committed the crime of theft by misappropriating a sum of more than $5,000.00 but less than $25,000.00. These allegations stemmed from the defendant's misuse of funds that were generated in cash at the front counter in the clerk's office. Through testimony of clerk's office employees and the legislative auditor, the evidence established that each day a designated employee took the cash brought in at the counter the day before and reconciled it with receipts written for payments made in cash. If there was more cash than reflected by the receipts, the overage was placed in a cash box held

9

separately and the amount that matched the receipts was deposited in the clerk's Salary Fund. The testimony established all money brought in at the front counter for copies, marriage licenses, filing of deeds and mortgages and other matters not associated with on-going litigation should have been deposited in the clerk's Salary Fund, which is public money. The evidence showed the money that was placed in this cash box was used to fund office parties, to buy pizza for election workers, and on occasion, the defendant would use funds from the box to pay the cost of marriage licenses for the friends who came into to clerk's office to apply for a license. During the period examined by the legislative auditor's office, it was established that $5,200.00 was diverted to this box instead of being deposited in the clerk's Salary Fund. It was uncontroverted that all money taken in at the front counter should have been deposited into to clerk's Salary Fund. Therefore, it was established that public money was misappropriated to private use since none of the expenditures listed above could have been legally paid for with public funds. Again, the defendant does not contest the evidence and, as in Count 6, it is uncontroverted.

The defendant instead argues that the state failed to establish an essential element of the crimes alleged, the intent to permanently deprive anyone of their money. The element of criminal intent must frequently be established by circumstantial evidence. *State v. Schmidt*, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105. The finder of fact must consider the testimony and evidence presented as a whole, including all the surrounding circumstances and the actions taken by the defendant, to determine whether a defendant had the requisite specific intent to commit the crime charged. *Id.* In this case, like all other elements of theft, the state was required to prove an "intent to deprive the other permanently" of the funds that were established to have

10

been misappropriated. This element of the offense had to be proved beyond a reasonable doubt.

With regard to Count 6, the state established the defendant made no attempt to contact the parties to whom the money belonged and to whom the checks had been written, in spite of the fact that many were local attorneys and/or individuals known to the defendant and who could have been contacted with a minimum of effort. In addition, although the defendant used a specific system to write all legitimate checks that were issued by the clerk's office, a totally separate software program was used to recreate the checks used to divert the money into the salary account. This allowed him to recreate the same check number of the original check. When the check was processed through the bank, it appeared on the face of the books, should they be examined, that the original check had been processed. This entire scheme reflects deception, an active attempt to disguise the misappropriation, and an attempt to permanently deprive the legitimate owners of their money. It also was a violation of the law which requires any monies they legitimately could not return to legal owners to be sent to the state treasurer as unclaimed funds. The evidence presented, when analyzed under the *Jackson* standard, established an intent to permanently deprive the legitimate owners of their money. All elements of the offense of theft were proven beyond a reasonable doubt.

With regard to Count 9, the evidence clearly shows that cash which should have been deposited into the salary fund was diverted into a box from which it was used improperly to pay for expenses that can only, legally, be paid for with private funds such as parties and marriage licenses. The very actions of the defendant in his use of the funds and his attempt to conceal the box when his office came under investigation reflect an intent to permanently deprive. This element of the offense, as well as all other elements of theft, was proved beyond a reasonable doubt.

11

This court, therefore, finds sufficient evidence to establish beyond a reasonable doubt the defendant is guilty of both Counts 6 and 9 as to the theft charges.

## FILING OR MAINTAINING FALSE PUBLIC RECORDS

In Counts 3 and 7, the defendant was charged with Filing or Maintaining False Public Records. Filing or maintaining false public records, a violation of La.R.S. 14:133, is defined in relevant part as:

> A. Filing false public records is the filing or depositing for record in any public office or with any public official, or the maintaining as required by law regulation or rule, with knowledge of its falsity, of any of the following:
>
> (1) Any forged document.
>
> (2) Any wrongfully altered document.
>
> (3) Any document containing a false statement or false representation of a material fact.

In regards to Count 3, the state offered testimony, including the defendant's own statement, that periodically the staff in the clerk's office, at the direction of the defendant, would conduct "suit clean-up." In this process, funds left in a lawsuit that had no movement for a period of five years and was considered stale were transferred from the advance deposit account to the clerk's Salary Account. Some of the amounts transferred were quite small and some suits had balances of several thousand dollars which were transferred. The testimony established that in none of the 12,137 lawsuits from which transfers were made had the clerk's office done any work which would justify the transfer of funds to the clerk's Salary Fund. Because these funds could not be transferred for a legitimate reason, the defendant instructed his staff to make a notation of "cc" or "xc," the notation which reflects copies of documents were made, so that it would appear on the face of the document that these were legitimate charges for which the clerk's office was due payment. The

falsification of these records and the purpose for that falsification are not in dispute. The defendant argues the false ledger entries were not "material" and, therefore, a necessary element of the offense is missing. The use of the fraudulent "cc" and "xc" notations were central to these transfers and used to conceal the fact the clerk was transferring money which had not been earned by the clerk's office from the advance fund to the Salary Fund. These notations were material, and all elements of La.R.S. 14:133, when reviewed pursuant to the *Jackson* standard were proved beyond a reasonable doubt.

In regards to Count 7, as previously discussed, the defendant's office, at his instruction, issued new checks with the same check numbers as the original refund checks that had not been negotiated and made the clerk's office the payee. This process allowed funds to be improperly moved from the advance deposit account, where it had been deposited by its legitimate owners, to the clerk's Salary Account. This use of check numbers that mirrored the numbers of the original checks was used to conceal the improper transfers by effectively falsifying the clerk's records which were subject to audit. The state submitted evidence that established all elements of La.R.S. 14:133 as to Count 7, which when reviewed under the *Jackson* standard prove the defendant's guilt beyond a reasonable doubt.

## MALFEASANCE IN OFFICE

The defendant was charged with malfeasance in office in Counts 4, 5, 8, 10, 11, 13, and 14. Count 13 was discussed above, has been vacated, and will not be discussed herein.

Malfeasance in office is defined in La. R.S. 14:134, which states in pertinent part:

A. Malfeasance in office is committed when any public officer or public employee shall:

13

(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or

(2) Intentionally perform any such duty in an unlawful manner; or

(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

B. Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.

Count 4 pertains to the defendant's breach of duty to refund money on deposit in the clerk's office to those individuals who had deposited it in violation of La.R.S. 13:842(B). Count 5 pertains to the defendant's failure to fulfill his duty to remit unclaimed property (i.e., money related to "stale" lawsuits) to the state treasury in accordance with La.R.S. 9:151 – 9:182. Count Eight pertains to the defendant's failure to fulfill his duty to remit unclaimed property (i.e., sums represented by unnegotiated checks) to the state treasury in accordance with La.R.S. 9:151 – 9:182. Count 10 pertains to the defendant's failure to fulfill his duty under La. R.S. 13:781 to collect all fees and charges due his office and deposit them into the Clerk's Salary Fund, instead of diverting cash into a box, where little to no accurate accounting of those funds was kept. Count 11 pertains to the defendant's misapplication of public funds and misuse of the public funds in his care to pay for expenses not allowed by law in violation of La.R.S. 42:1461. Specifically, the defendant used government funds to pay for an employee's membership to Sam's Discount Club and for an annual membership fee. Count 14 pertains to the defendant's failure to use government property for public benefits in violation of La.R.S. 42:1461.

14

Specifically, that he used points accrued for use of a government credit card to pay for a personal vacation.

The facts for all the underlying allegations for which the state argues the defendant committed malfeasance in office are discussed above and will not be repeated here, with the exception of Counts 11 and 14 which we will discussed in more detail.

The state presented testimony that established an office employee obtained a Sam's Club card through the clerk's office which was for her personal use. On at least one occasion, the defendant used public funds from the clerk's office to pay for the annual fee for that membership. The state further submitted evidence that the clerk's office possessed a credit card which was used for legitimate office expenses. This credit card was the type that collected or accrued "points." The unrefuted testimony presented established that the defendant cashed in those points for debit cards which he used to pay for a personal vacation.

The defendant does not contest the underlying facts. He argues that his actions on all the above counts amounted to mere negligence, that his actions were not intentional. The jury, however, found him guilty of the underlying facts in their consideration of both theft cases and in all counts of filing and maintaining false records (excluding Count 2 and Count 13, the charges on which there were non-unanimous verdicts as previously discussed). This reflects the jury's belief he acted intentionally in those instances. The record supports those convictions. His arguments that he relied on advice from his accountant and auditor are contradicted by the testimony of both. His arguments that he was ignorant of laws pertaining to management of abandoned property are contradicted by direct testimony from both a former employee and his previous employer. Further, ignorance of the law is no defense. La.R.S. 14:17; La.Civ.Code art. 5.

15

Having reviewed the evidence presented under the *Jackson* standard as to sufficiency of evidence, we find there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the defendant committed the offenses charged in Counts 4, 5, 8, 10, 11, and 14.

## RACKETEERING

Count 1 alleges the defendant committed the offense of racketeering. Racketeering activity is defined by La.R.S. 15:1352, which states in pertinent part:

> A. As used in this Chapter, "racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950, the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law:
>
> . . . .
>
> (10) R.S. 14:67 (Theft)
>
> . . . .
>
> (38) R.S. 14:133 (Failing or maintaining false public records)
>
> . . . .
>
> B. "Enterprise" means any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities.
>
> C. "Pattern of racketeering activity" means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992 and that the last of such incidents occurs within five years after a prior incident of racketeering activity.

Further, La.R.S. 15:1353 states:

> A. It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such

16

proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise.

B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.

C. It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

D. It is unlawful for any person to conspire or attempt to violate any of the provisions of Subsections A, B, or C of this Section.

The defendant's argument is that, since the underlying crimes of theft and filing false records were unproven, the racketeering charge that rested on them is likewise unproven. Since this court has found the evidence sufficient to find the underlying charges were proven by the state, this argument fails. However, the defendant also argues that since he never received any proceeds from the activities at issue, he has not violated the proscriptions contained in La.R.S. 15:1353. The state disputes this assertion but provides no details. It takes the position that the issue of whether the defendant personally profited from the activities at issue is immaterial to the analysis. This assertion by the state is incorrect, due to the language of La.R.S. 15:1353.

The record includes testimony that the defendant improperly used $400.00 worth of reward points from a clerk's office credit card for himself. Also, the defendant took money from the cash box that contained overages from transactions at the front desk. The record, however, indicates that he primarily used the money for office activities such as Christmas parties, all of which has been previously discussed. It is debatable whether the defendant "received any proceeds" within the meaning of the La.R.S. 15:1353.

17

In vacating judgments of forfeiture pursuant to racketeering allegations, the supreme court explained:

> Section 1353 by its terms prohibits a person, when he has knowingly received funds derived from drug racketeering activity as defined in La.R.S. 15:1352(A), only from using or investing the funds either (1) to acquire title to or an interest in immovable property or (2) to establish or operate any enterprise. Section 1353 does not purport to prohibit the mere receipt of funds from drug racketeering activity or to prohibit any other use or investment of such funds. This section is clearly intended as an anti-laundering statute to permit the pursuit of drug-related funds which have been invested in real estate or in business enterprises by persons who knew the source of the funds.
>
> We therefore reject the district attorney's contention that the statute's making it unlawful "to use or invest . . . any part of such proceeds . . . in the acquisition of any title to, or any right, interest or equity in immovable property or in the establishment or operation of any enterprise" should be construed as prohibiting *either* (1) any use of such funds *or* (2) investment of such funds in real estate or business enterprises. Such an interpretation is grammatically inconsistent with the wording of the statute and is also inconsistent with the stated purpose of Act 727.
>
> Because Act 727 [the enacting legislation] was apparently patterned after 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations Act), federal decisions in this area are persuasive. 18 U.S.C. § 1962(a) makes it unlawful for a person who has received income from racketeering activities "to use or invest, directly or indirectly, any part of such income . . . in acquisition of any enterprise". In *Hemmings v. Barian*, 822 F.2d 688 (7th Cir.1987), the court held that for a violation of Section 1962 there must be, in addition to a pattern of racketeering activity, an investment in another enterprise of the funds received from the racketeering activity. In *United States v. Cauble*, 706 F.2d 1322, 1331 (5th Cir.), *cert. denied*[,] 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984), the court held that the government, in order to establish a Section 1962 violation, must prove the existence of an enterprise, the defendant's derivation of funds from a pattern of racketeering activity, and the use of any part of that income in acquiring an interest in or operating the enterprise. In *United States v. Rone*, 598 F.2d 564 (9th Cir.1979), *cert. denied*[,] 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), the court noted that the statute "seeks to bar the investment of racketeering moneys [and] the acquisition of property through a pattern of racketeering activity". *Id.* at 568. And in *Guerrero v. Katzen*, 571 F.Supp. 714 (D.C.D.1983), *affd.* 774 F.2d 506 (D.C.Cir.1985), the court held that "the gravamen of § 1962(a) is not the receipt of funds or benefits from a pattern of racketeering activity; rather, it is the investment of such funds to acquire an interest in, establish, or operate an enterprise". *Id.* at 721. The court further stated:

> RICO does not forbid engaging in racketeering activity or even in a pattern of such activity. Section 1962(a) requires that a person receive income from a pattern of racketeering activity and that he use the income to establish, operate or acquire an interest in an interstate enterprise.

*Id.* at 718. (emphasis in original).

> Therefore, the prosecutor in this case could not prove a violation of La.R.S. 15:1353 by merely showing Johnson had used proceeds of drug activity. It was necessary to prove use or investment in the acquisition of immovable property or in the establishment or operation of any enterprise. Because there is no suggestion of Johnson's investment in immovable property, the decision turns on whether a deposit in a savings account is use or investment in an enterprise.

*State v. Nine Savings Accounts*, 553 So.2d 823, 825-26 (La.1989)(footnote omitted)(fourth alteration in original).

The facts proven at trial do not meet the requirements of La.R.S. 15:1353. Although the record reflects the defendant received a certain amount of proceeds from his activities, there is no evidence he used them in an enterprise pursuant to ongoing racketeering activity. Therefore, this court finds insufficient evidence to support the defendant's conviction on the charge of racketeering. That conviction is reversed, and the sentence for that charge is vacated.

## ASSIGNMENT OF ERROR NUMBER ONE

In the first error assigned by the defendant, he argues the district court erred by ruling against his *Batson* challenge. The analysis for such challenges has been explained by the Louisiana Supreme Court:

> In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, (1986), the Supreme Court held that it is an equal protection violation for the state to exercise its peremptory strikes to remove jurors from the venire panel solely on the basis of the juror's race. *Batson* provides a three-step process to guide courts faced with a claim of racial discrimination in the voir dire process:

> > First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the

19

prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, __ U.S. __, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ). The burden of persuasion never shifts from the opponent of the strike. However, after establishing a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its actions. "The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar." *State v. Collier*, 553 So.2d 815, 820 (La. 1989) (adopting the holding of *Batson* ). If a race-neutral explanation is tendered, the trial court must decide whether the defendant has proven purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (citations omitted). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Batson*, 476 U.S. at 98, n.21, 106 S.Ct. 1712 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

*State v. Turner*, 16-1841, pp. 50-51 (La. 12/5/18); 263 So.3d 337, 374, *cert. denied*, ___ U.S. ___, 140 S.Ct. 555 (2019)(footnote omitted)(alterations in original).

During voir dire, the following colloquy took place:

BY MR. MCLINDON:

Judge, we're going to be making a Batson challenge do you want it now or do you want to wait?

BY THE COURT:

Give me a [few] minutes, let me see what I got. Okay. Let's hear about your challenge.

BY MR. MCLINDON:

So I found one they used a peremptory to strike -- five or their six strikes were African Americans, so I think they have to give race-neutral reasons for those.

BY MR. COLWART:

Well, you got to look at all of them.

BY THE COURT:

Yeah, not just the panel, I've got to look at all their - -

BY MR. MCLINDON:

I'm sorry?

BY MR. COLWART:

We have African Americans on the jury.

BY MR. MCLINDON:

I know, but of your strikes you've used five or six on Panel A were African Americans.

BY MR. COLWART:

And on Panel B, you add them all together.

BY MR. MCLINDON:

I'm getting there. So Panel B you have stricken seven total and they are African Americans. I think they have to give race neutral reasons for those.

BY THE COURT:

Okay. Let me see what I've got left here. Panel A, I've got four blacks on Panel A, and I have –

BY MS. LOWE:

There's five on Panel A that they've stricken.

BY MR. COLWART:

We have three African Americans on Panel A and we have –

BY THE COURT:

We've got more than that.

BY MS. CHARRIER:

Yeah, we have several African Americans on Panel A.

BY THE COURT:

Hold on let me look at Panel A.

BY MR. COLWART:

I think it's how many jurors you have and have all of the vast majority of the African Americas have been struck, that's a pattern. And we're saying there isn't a pattern because we have four – I haven't looked at all of them. We have at least four African Americans on the jury, so how can you say that's a pattern of cutting all African Americans?

BY MR. MCLINDON:

Well, I look at it, Judge, as a percentage of your peremptories -- what percentage of your peremptories are used to strike African Americans.

BY THE COURT:

I think the result is how many do you have on the jury. I mean the difficulty we have is the vast majority of our jurors were black. I mean, I'm counting on Panel A, I have – Panel A we had – how many we had?

BY MS. LOWE:

Ten and eleven, there were ten black and eleven white on Panel A.

BY THE COURT:

And now Panel A we now have --

BY MR. COLWART:

Three.

BY THE COURT:

Four, I have four blacks on Panel A out of twelve jurors. Now how many do we have on Panel B?

BY MS. LOWE:

> I see one.

BY THE COURT:

> We got one on Panel B, so we've got five blacks out of twelve jurors.

BY MR. COLWART:

> We're at eleven now.

BY THE COURT:

> We're at eleven. Okay. We got five blacks out of eleven, I find that difficult to say that they're being excluded.

BY MR. MCLINDON:

> All right. Just note my objection for the record.

BY THE COURT:

> Yes, sir, I understand, but --

BY MR. MCLINDON:

> Yes, Sir.

It is clear that the district court considered the first part of the analysis under *Batson*, i.e., whether the defendant made a prima facie case of racial discrimination, and concluded there was no pattern of racial discrimination established.

The supreme court has discussed at length the considerations for determining whether the defendant has established a prima facie case discrimination:

> In the instant case, the only issue before the Court is whether defendant met his burden of proof under the first *Batson* factor and established a prima facie case of purposeful discrimination in the state's exercise of its peremptory challenges. When determining whether the defendant has made the requisite prima facie showing, the court in *Batson* held the trial court should consider all relevant circumstances, including a pattern of strikes against black jurors and the prosecutor's questions and statements during voir dire examination and in exercising his challenges. 476 U.S. at 96-97, 106 S.Ct. at 1723; *State v. Duncan*,

99-2615, p. 13 (La.10/16/01); 802 So.2d 533, 544. The Court refused to provide guidance beyond these two illustrations, choosing instead to rely upon experienced trial judges to decide whether the circumstances surrounding the prosecutor's use of peremptory challenges creates a prima facie case of discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Duncan*, 99-2615 at 13, 802 So.2d at 545. Because the trial judge's findings in this context will largely turn on evaluations of credibility, a reviewing court ordinarily should give those findings great deference. 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.

This Court, however, has provided additional guidance by enumerating several other factors Louisiana courts may consider in determining whether a defendant has made a prima facie case of purposeful discrimination. For example, in *State v. Green*, this Court held "the defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden." 94-0887, p. 24 (La.5/22/95); 655 So.2d 272, 288. Such facts include, but are not limited to, a pattern of strikes by the prosecutor against members of a suspect class, statements or actions by the prosecutor that indicate the peremptory strikes were motivated by impermissible considerations, the composition of the venire and of the jury finally empanelled [sic], and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination. *Id.* (citing *State v. Collier*, 553 So.2d 815 (La.1989); *State v. Thompson*, 516 So.2d 349 (La.1987), *cert. denied*, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988)). This Court has also taken into consideration whether the nature of the case presented overt racial overtones, the timing of the defendant's objection, and whether the trial judge thought the issue of purposeful discrimination was "very close." *State v. Draughn*, 05-1825, pp. 26-27 (La.1/17/07); 950 So.2d 583, 603-04.

In this case, the defense claims it established a prima facie case of discrimination numerically because the state used peremptory challenges to strike five of seven prospective black jurors (71%) and only six of twenty-seven prospective white jurors (22%), thereby striking black jurors at a rate of more than three times that of white jurors. The district court clarified there were eight prospective black jurors available for jury selection and the state had challenged five, one was excused by the defense, one was selected for the jury, and one was available as an alternate. The district court then found the defense had established a prima facie case of purposeful discrimination and ordered the state to provide race-neutral reasons for striking the jurors. The state objected to the court's order and asked the court to articulate its reasons for finding a prima facie case of discrimination so the state could make an informed decision regarding whether it would seek appellate review. Before the court could do so, however, the state argued it only struck five out of eight black jurors, thereby lowering the percentage of black jurors struck from 71% to 62.5%. The state further claimed it struck every juror who rated himself as a "four" on the state's five-point scale,

regardless of race, indicating a preference towards imposing a life sentence. When the court asked whether this was the state's race neutral reason, the state responded, "it is a component of it," but further explained, "that is not a race neutral reason, that is a correction of the factual basis set for the prima facie case." Throughout its objection, the state repeatedly emphasized it was not providing its race neutral reasons for the strikes. After hearing the state's explanation, the court set aside its previous order and denied the *Batson* challenge, finding there was no systematic pattern of exclusion based upon race.

Upon review, we find no abuse of discretion in the district court's ruling. As the state noted, this Court has held bare statistics are insufficient to support a prima facie case of discrimination. *State v. Duncan*, 99-2615, p. 22 (La.10/16/01), 802 So.2d 533, 550 (citing *United States v. Moore*, 895 F.2d 484, 485 (8th Cir.1990)). In *Duncan,* the defendant argued racial discrimination could be inferred from the record, which showed that the state had struck 84% of the prospective black jurors and only 12% of the prospective white jurors, using five of its eight peremptory challenges to strike black jurors. This Court held, "there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out." 99-2615 at 22, 802 So.2d at 549-50. However, the Court explained "such number games, stemming from the reference in *Batson* to a 'pattern' of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied." 99-2615 at 22, 802 So.2d at 550. This Court further held it is important for the defendant to come forward with facts, not just numbers alone, when asking the district court to find a prima facie case. *Id.* (citing *Moore*, 895 F.2d at 485). Consequently, in *Duncan* this Court held the defendant's reliance on bare statistics to support a prima facie case of race discrimination was misplaced.

Applying *Duncan* to the instant case, we hold the defendant's reliance upon statistics alone does not support a prima facie case of race discrimination.

*State v. Dorsey*, 10-216, pp. 12-15 (La. 9/7/11), 74 So.3d 603, 616-17, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012) (footnote omitted). Pursuant to *Dorsey*, it seems clear that the defendant's simple assertion of the number of black jurors stricken was not sufficient to meet the first step of the *Batson* analysis. Also, the fact that the jury ultimately included African Americans is relevant to assessing the state's intent on this issue. *Turner*, 263 So.3d at 375. At the time the objection was

made five of the eleven seated jurors were African American. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, the defendant argues that the district court erred by denying his motions to quash Counts 6, 7, and 8 because they had prescribed. Both parties agree that the charges are based on actions that took place in April 2012. The indictment was filed more than six years later in June of 2018, which is beyond the statutory time limit that the defendant cites. The controlling article, La.Code Crim.P. art. 572, states in pertinent part:

> A. Except as provided in Articles 571 and 571.1, no person shall be prosecuted, tried, or punished for an offense not punishable by death or life imprisonment, unless the prosecution is instituted within the following periods of time after the offense has been committed:
>
> (1) Six years, for a felony necessarily punishable by imprisonment at hard labor.
>
> (2) Four years, for a felony not necessarily punishable by imprisonment at hard labor.

The state argues, as it did at the pretrial hearing, that La.Code Crim.P. art. 573 controls. The article states, in pertinent part:

> The time limitations established by Article 572 shall not commence to run as to the following offenses until the relationship or status involved has ceased to exist when:
>
> (1) The offense charged is based on the misappropriation of any money or thing of value by one who, by virtue of his office, employment, or fiduciary relationship, has been entrusted therewith or has control thereof.

The terms of La.Code Crim. P. art. 573 clearly apply to the present case. However, as the state observes, the defendant counters by arguing the existence of "an 'exception to the exception.'" In essence, the defendant's argument is that La.Code Crim.P. art. 573 does not apply because the defendant's conduct at issue was well-known within his office. The defendant cites *State v. Lester*, 49,787

26

(La.App. 2 Cir. 5/20/15), 165 So.3d 1181, for the proposition that the date of commission of an offense, rather than when it became known, controls. The state argues that La.Code Crim.P. art. 573 exists for the type of situation at issue. We find *Lester* is inapplicable. The opinion itself states that article 573 did not apply to the scenario that was at issue. However, the article's language clearly applies to the set of facts at issue in the present case. The defendant has failed to demonstrate a legal basis for "an exception to the exception." This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FOUR**

In his fourth assignment, the defendant argues the district court erred by qualifying assistant legislative auditor Roger Harris as an expert witness. The relevant colloquy appears in the record:

BY MR. MCLINDON:

> I object, Your Honor, he can not give an opinion.

BY THE COURT:

> Of course I have to decide whether or not he's eligibly [sic] to be classified as an expert.

BY MR. COLWART:

> Excuse me?

BY THE COURT:

> I have to make the decision if he's an expert.

BY MR. COLWART:

> Right.

BY MR. MCLINDON:

> Judge, had I been put on notice that they were calling an expert witness I might've gone and hired my own expert witness, it's the first time I ever heard that they're going to call an expert witness.

BY MR COLWART:

Your Honor, the code article [states] we only have to give notice if there's no written report.

BY THE COURT:

I know.

BY MR COLWART:

And he's been having this legislative audit since day one.

BY MR. MCLINDON:

Judge, if you want to look at the written report none of the requirements of Article 719 are in there.

BY THE COURT:

Let me see the report. (Reviewing document.)
Name your witness again?

BY MR. COLWART:

Excuse me?

BY THE COURT:

The name of the witness that you're wishing to call first?

BY MR. COLWART:

I'm sorry, I can't hear you.

BY THE COURT:

The name of the witness you wish to call first?

BY MR. COLWART:

Roger Harris.

BY THE COURT:

Thank you. Okay. Code article reads if the witness preparing the report will be called as an expert the report shall contain the witness' area of expertise, his qualifications. He's a member of the legislative auditor's

staff, that indicates his area of expertise. His qualifications are listed with his name, director of investigative audits Roger W. Harris, JD, juris doctorate, CCEP, which I think stands for -- I find that those are sufficient to contain his areas of expertise and his qualifications, the report does have a list of materials upon which his conclusion is based and his opinion or reason thereof are cited in the report. I'm going to allow the State to introduce him as an expert.

BY MR. MCLINDON:

Just note my objection for the record.

BY THE COURT:

Yes, sir. Thank you. Okay.

The code article at issue, La.Code Crim.P. art. 719, states in pertinent part:

Upon written motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of a physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. If the witness preparing the report will be called as an expert, the report shall contain the witness's area of expertise, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor. If the expert witness has not reduced his results to writing, or if the expert witness's written report does not contain the information required of an expert as provided in this Article, the state must produce for the defendant a written summary containing any information required to be produced pursuant to this Article but absent from a written report, if any, including the name of the expert witness, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor.

Thus, the district court's reading of the article was correct. Further, the defendant did not dispute receiving the report or that it contained the information recited by the district court. A district court's ruling regarding the qualification of an expert will not be disturbed absent an abuse of discretion. *State v. Middleton*, 19-110 (La.App. 3 Cir. 6/19/19), 275 So.3d 440, *writ denied*, 19-1177 (La. 10/15/19), 280 So.3d 600. The defendant has not established such an abuse of discretion. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

In his fifth assignment of error, the defendant argues the district court erred by denying his Motions for Arrest Judgment, Motion for New Trial, and Motion to Quash Indictment. The core argument of his assignment is that improprieties took place during grand jury proceedings. He alleges that the recording of grand jury proceedings shows that prosecutors talked to the grand jury during deliberations, while the defendant was out of the room.

The defendant cites La.Code Crim.P. art 442, which states, in pertinent part:

> A grand jury shall hear all evidence presented by the district attorney. It may hear evidence for the defendant, but is under no duty to do so.
>
> . . . .
>
> A grand jury should receive only legal evidence and such as is given by witnesses produced, or furnished by documents and other physical evidence. However, no indictment shall be quashed or conviction reversed on the ground that the indictment was based, in whole or in part, on illegal evidence, or on the ground that the grand jury has violated a provision of this article.

The defendant also cites La.Code Crim.P. art. 433(B): "No person, other than a grand juror, shall be present while the grand jury is deliberating and voting."

The state responds that nothing prevents prosecutors from addressing the grand jurors before deliberations, i.e., before the matter has been submitted to the jury for its final consideration. The colloquy at issue appears at 6:21:18 on the cd recording of the grand jury proceedings. The defendant's counsel asked to step out with the defendant at 6:21:18; they returned at 6:24:45; and the defendant continued testifying before the grand jury. Thus, it appears the state is correct in asserting, as the district court found at the hearing on the defendant's motions, that the prosecutors' comments occurred before, not during, the grand jury's deliberations.

30

During the colloquy at issue, a prosecutor stated to the grand jury that the defendant was lying. Acknowledging that La.Code Crim. P. art. 442 states no indictment shall be quashed nor conviction reversed due to a grand jury's use of illegal evidence, the defendant argues that the state's argument in this case constituted "more than evidence." Further, he argues that by making the statements at issue, the prosecutor rendered himself an "unauthorized person" within the meaning of the relevant code articles. On these latter two points, the defendant provides no supporting jurisprudence.

The defendant made these arguments at the hearing on his motions. The state raised procedural objections. A review of the record supports the conclusion that the motions lacked an underlying factual basis, as the prosecutors did not participate in the grand jury's deliberations.

The state further argues, as it did in district court, that the motions were procedurally improper. It cites La.Code Crim.P. art. 533, which states in pertinent part: "A motion to quash an indictment by a grand jury may also be based on one or more of the following grounds: . . . (3) A person, other than a grand juror, was present while the grand jurors were deliberating or voting, or an unauthorized person was present when the grand jury was examining a witness." It is apparent from the earlier analysis that this is the type of claim the defendant is making. The state alleges that by bringing the motion after commencement of trial (in fact, after conviction) the defendant waived his right to bring the motion.

Regarding the timing of the motion, we note La.Code Crim.P. art. 535:

> A. A motion to quash may be filed of right at any time before commencement of the trial, when based on the ground that:
>
> > (1) The offense charged is not punishable under a valid statute;

31

(2) The indictment does not conform with the requirements of Chapters 1 and 2 of Title XIII [regarding the form of the indictment; *see* La.Code Crim. P. arts. 461 et seq. and 466 et seq.];

(3) Trial for the offense charged would constitute double jeopardy;

(4) The time limitation for the institution of prosecution has expired;

(5) The court has no jurisdiction of the offense charged;  or

(6) The information charges an offense for which prosecution can be instituted only by a grand jury indictment.

(7) The individual charged with a violation of the Uniform Controlled Dangerous Substances Law has a valid prescription for that substance.

These grounds may be urged at a later stage of the proceedings in accordance with other provisions of this Code.

B. A motion to quash on the ground that the time limitation for commencement of trial has expired may be filed at any time before commencement of trial.

C. A motion to quash on grounds other than those stated in Paragraphs A and B of this Article shall be filed in accordance with Article 521 [i.e., within fifteen days of arraignment].

D. The grounds for a motion to quash under Paragraphs B and C are waived unless a motion to quash is filed in conformity with those provisions.

E. The court may, in order to avoid a continuance, defer a hearing on a motion to quash until the end of the trial.

Since the ground of the motion to quash at issue appears in a different code article, La.Code Crim.P. art. 533, and does not appear in Paragraph A or B of article 535, the time limitation of La.Code Crim.P. arts. 535 (C) and 521 applies, i.e., the motion to quash should have been raised within fifteen days of arraignment.[1]  The

---

[1]In 2020, after the trial in the case, the legislature changed the time period of filing pretrial motions to thirty days after receipt of initial discovery. 2020 La. Acts No. 252 § 1.

State cites *State v. Johnson*, 07-1040 (La.App. 4 Cir. 11/10/08), 993 So.2d 326, *writ denied,* 08-2649 (La. 6/5/09), 9 So.3d 868, for the proposition that a failure to timely object can waive the ability to file a motion to quash based upon a defective indictment. We note that *Johnson* cited La.Code Crim.P. arts. 535 and 521.

Further, the state argues that the defendant should have been aware of the colloquy at issue because the relevant material was provided to him in discovery. The state notified the defendant approximately two and a half weeks before trial that it would be playing audio at trial and asked him if there was anything that he wanted excised. Defense counsel did not deny receiving the materials but noted he had already sat through the grand jury proceedings and did not want to listen to three hours of audio. Therefore, he relied on the transcript he had, which apparently did not include the relevant colloquy, and argued he was entitled to do so. Defense counsel made a decision about how to budget his time in preparing for trial. This does not form a valid basis for obviating the time limitations in La.Code Crim.P. arts. 535 and 521.

Ultimately the district court denied the motions for both procedural and substantive reasons. We agree with the trial court's ruling.

As this discussion shows, there were both substantive and procedural bases for denying the motion to quash.

Regarding the motion for new trial, La.Code Crim.P. art. 851 states, in pertinent part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
> . . . .

(4)     The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.

For the reasons previously discussed in regard to the procedural barriers to the motion to quash, the defendant failed to establish the exercise of reasonable diligence, as required by this article. Therefore we find this argument lacks merit.

The defendant also assigns as error about the denial of his motion for arrest of judgment, although his argument on this point is very brief. The relevant article, La.Code Crim.P. art. 859, states, in pertinent part:

> The court shall arrest the judgment only on one or more of the following grounds:
>
> (1)  The indictment is substantially defective, in that an essential averment is omitted[.]

For the reasons discussed regarding the substantive issues relating to the indictment, the defendant has failed to demonstrate that said document is defective. This assignment of error lacks merit.

## CONCLUSION

The defendant's conviction and sentence for racketeering (Count 1) is reversed and set aside as the evidence is insufficient to prove an essential element of the charge, and a judgment of acquittal as to the charge is hereby entered. The defendant's convictions and sentences in Count 2 (theft), Count 12 (perjury) and Count 13 (malfeasance in office) are vacated pursuant to *Ramos*, as the jury verdict on those charges was not unanimous. The defendant's convictions and sentences for Count 3 (filing or maintaining false public records), Count 4 (malfeasance in office), Count 5 (malfeasance in office), Count 6 (theft), Count 7 (filing or maintaining false public records), Count 8 (malfeasance in office), Count 9 (theft), Count 10 (malfeasance in office), Count 11 (malfeasance in office), and Count 14

34

(malfeasance in office) are affirmed. The case is remanded for the trial court to clarify the count or counts on which the order of restitution or a fine is ordered.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**